IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MARK McCLARY,

        Plaintiff,                                CIV S-11-1226  GGH

        vs.

MICHAEL J. ASTRUE,                      ORDER
Commissioner of Social Security,
        Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). For the reasons that follow, plaintiff's Motion for Summary Judgment is granted in part, the Commissioner's Motion for Summary Judgment is denied, and this matter is remanded to the ALJ for further findings as directed in this opinion. The Clerk is directed to enter judgment for plaintiff.

BACKGROUND

        Plaintiff, born March 16, 1969, applied for disability benefits on May 12, 2008. (Tr. at 124, 132.) Plaintiff alleged he was unable to work since August 8, 2007, due to a right

1

leg injury, bipolar disorder, and depression.  (Tr. at 148, 182.)  In a decision dated February 19, 2010, ALJ William C. Thompson, Jr. determined that plaintiff was not disabled.  The ALJ made the following findings:[1]

> 1. Based on earnings through 2006, the claimant met the insured status requirements of the Social Security Act only through December 31, 2008.
>
> 2. The claimant has not engaged in substantial gainful activity since August 8, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The claimant has the following medically determinable impairments: obesity (*see*, e.g., Exhibit 2E, P. 1), status post healed fracture to the lower right leg caused by gunshot wound (Exhibit 1F, pp. 2, 30), a bipolar disorder (Exhibit 11F, p. 80), and a history of alcohol abuse in reported recent remission (*see*, e.g. Exhibit 15F, p. 4) (20 CFR 404.1520(c) and 416.920(c)).

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

    4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

    5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for two out of eight hours, and sit for six hours in an eight-hour workday. He cannot climb ladders, ropes, or scaffolds. He cannot work at heights. He can perform simple work. He can tolerate only restricted contact with coworkers and the public, with "restricted" defined as inability to be part of a team or perform cooperative work.

    6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

    7.     The claimant was born on March 16, 1969. On August 8, 2007 (the alleged onset date), he was 38 years old, which is defined as a "younger individual" (20 CFR 404.1563 and 416.963).

    8.     The claimant has a "limited" education and is able to communicate in English (20 CFR 404.1564 and 416.964).

    9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

    10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

    11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 8, 2007 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. at 11-25.)

\\\\\

\\\\\

1 ISSUES PRESENTED

2       Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Properly

3 Credit the Treating and Examining Physicians' Opinions, and Ignored Limitations of One

4 Physician While Purporting to Accept the Opinion; and B.  Whether the ALJ Failed to Credit the

5 Vocational Expert's Testimony in Response to a Hypothetical Which Accurately Reflected

6 Plaintiff's Functional Limitations.

7 LEGAL STANDARDS

8       The court reviews the Commissioner's decision to determine whether (1) it is

9 based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

10 the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

11 Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

12 Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

13 as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d

14 625, 630 (9th Cir. 2007), *quoting* Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

15 is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

16 ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

17 "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

18 rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

19 ANALYSIS

20    A.  Rejection of Treating and Examining Doctors' Opinions

21       Plaintiff contends that the ALJ improperly rejected the treating opinions of Drs.

22 Adeyemo and Graff, and the examining opinion of Dr. White, and ignored portions of the SSA

23 non-examining opinion of Dr. Morgan, upon which he relied for his decision.

24       The weight given to medical opinions depends in part on whether they are

25 proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

26

F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[2]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir. 2001),[3] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

---

[2]  The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

[3]  The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

insufficient to reject the opinion of a treating or examining professional. Lester, 81 F.3d at 831.

> The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir.1990); Gallant v. Heckler, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. .... And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record.

Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). The opinion of a non-examining physician may constitute substantial evidence when it is "consistent with independent clinical findings or other evidence in the record." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002). Such independent reasons may include laboratory test results or contrary reports from examining physicians, and plaintiff's testimony which conflicts with the treating physician's opinion. Lester, 81 F.3d at 831, citing Magallanes, 881 F.2d at 751-55.

In this case, the ALJ relied on the opinion of one non-examining state agency physician, and gave less weight to the opinions of all examining physicians, including treating physicians Drs. Graff and Adeyermo, and consultative examining physician Dr. White. Although the ALJ is permitted to rely on the opinions of non-examining professionals, he may do so only where he gives specific and legitimate reasons that are supported by an "abundance of evidence." Id. Such evidence might include laboratory test results, contrary reports from examining physicians, plaintiff's testimony which conflicts with a treating physician, higher expertise of non-examining medical advisor, and suspect nature of examining physicians' test results. Id., *citing* Andrews, 53 F.3d at 1043. Further, in Magallanes, 881 F.3d at 753(emphasis added), the court held that where the conflicting non-treating opinion is based on *independent* objective findings, it could constitute substantial evidence. Most recently, the Ninth Circuit restricted the ALJ further by holding that the opinion of a non-treating physician, when based on the same evidence relied on by the treating physician, but supporting a different conclusion from the

6

treating source, would not be considered substantial evidence.  Orn v. Astrue, 495 F.3d 625 (9th Cir. 2007).

        Here, the ALJ addressed each of the examining opinions which he declined to accept, stating his reasons in support, and then accepted the opinion of Dr. Morgan,[4] non-examining State Agency physician, who completed a check marked form on September 24, 2008. (Tr. at 389-91.)  See Murray v. Heckler, 722 F.2d 499, 501 (9th Cir.1983) (expressing preference for individualized medical opinions over check-off reports).  This report found that plaintiff was not significantly limited in understanding, remembering, and carrying out simple or detailed instructions.  (Tr. at 389.)  Plaintiff was also not significantly limited in maintaining a schedule and regular attendance, as well as being punctual, maintaining an ordinary routine without special supervision, working closely with others without being distracted, interacting appropriately with the public, accepting instructions and responding appropriately to criticism, maintaining social appropriate behavior, responding appropriately to changes in the work setting, and setting realistic goals.  (Tr. at 389-90.)  Plaintiff was found to be moderately limited in the ability to maintain attention and concentration for extended periods, to complete a normal workday and week without interruptions and perform at a consistent pace, and to get along with coworkers without distracting them.  (Id. at 389-90.)  This report contained no findings other than the statement, "[d]espite moderate impairments, claimant is able to complete a normal workday/workweek, in a setting that involves limited contact with others."  (Id. at 391.)

        Although not stated, it is assumed that this physician had plaintiff's records for review through the date of that report.  The treating physicians, in contrast, had examined plaintiff over several years and as late as one year after Dr. Morgan's report, or October, 2009. (Tr. at 660, 654.)  Not only did Dr. Morgan not have the most recent medical records for review, but he also did not state which records he was relying on for his decision.  In order for his

---

[4] The parties and the ALJ refer to Dr. Morgan as a psychiatrist; however, the record does not specifically indicate this physician's specialty.

1  opinion to be properly accepted, it must be based on independent clinical findings or other
2  evidence in the record.  Since Dr. Morgan did not cite the basis for his report, the court can only
3  presume that it was based on any of the evidence contained in the record, all of which contradicts
4  Dr. Morgan's conclusions, and all of which was rejected (or given less weight) by the ALJ.
5  　　　　In contrast, the ALJ rejected Dr. Graff's undated opinion because this psychiatrist
6  conceded that he did not know plaintiff well enough to assess his ability to work, because he was
7  not very familiar with plaintiff based on his mistaken belief that plaintiff had a limp from a back
8  injury, rather than a right leg injury from a gunshot wound, and because he expected plaintiff's
9  condition to improve in two to three months.  (Id. at 22.)  The ALJ found that this opinion was
10 vague and did not describe specific mental limitations.  (Id.)  The report itself states that plaintiff
11 suffered from depression, anxiety, dysphoria, and difficulty concentrating.  (Id. at 406.)  Dr. Graff
12 opined that plaintiff suffered from chronic and even life long difficulty with concentration.  (Id.
13 at 409.)  Dr. Graff commented that he sees plaintiff in a crisis clinic, and "there's nothing I've
14 written here that isn't <u>more clearly</u> described in his <u>medical records</u>."  (Tr. at 407, 410.)
15 (emphasis in original.)  The medical records referred to by Dr. Graff cover the period from
16 December, 2005 to May, 2008, but as clarified by the ALJ, plaintiff did not get treatment from
17 Dr. Graff between December, 2005 and October 2006, or from February, 2007 to January, 2008,
18 and then not again until May, 2008.  (Tr. at 18, 434-532.)
19 　　　　The ALJ next discussed treating psychiatrist Dr. Adeyermo.  The ALJ first noted
20 that plaintiff's testimony indicated that he saw this doctor every three to four months for
21 medication.  (Tr. at 17.)  He then noted that although Dr. Adeyermo offered a written opinion in
22 October, 2009, plaintiff did not submit any progress notes from this psychiatrist or La Familia,
23 where he treated plaintiff.  According to the ALJ, despite stating that he did not have sufficient
24 history of plaintiff to gauge his response to treatment, this doctor felt nevertheless qualified to
25 assess plaintiff's work related limitations.  The ALJ explained that therefore he was not accepting
26 this opinion which was unsupported and without treating notes.  There was no indication that Dr.

8

1  Adeyermo had reviewed treatment notes in forming this opinion.  Furthermore, at the hearing
2  plaintiff's representative confirmed that all records had been submitted.  Additionally, the ALJ
3  discounted this opinion because Dr. Adeyermo had failed to consider plaintiff's lapses with
4  medication compliance and relapses into alcohol and drug use.  (Tr. at 23.)

       Dr. Adeyermo's opinion, dated October 2, 2009, noted that his treatment was limited to medication management for plaintiff's bipolar disorder.  His comment when asked about plaintiff's response to treatment was "unknown.  Not enough time yet.  but appears to have responded well in the past."  Prognosis was guarded.  (Tr. at 654.)  Dr. Adeyermo completed a mental assessment which found that plaintiff had a poor ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stress, understand, remember and carry out complex or detailed job instructions, behave in an emotionally stable manner, and relate predictably in social situations.  (Tr. at 655-57.)  Plaintiff was found to have a fair ability to function independently, maintain attention and concentration, understand, remember and carry out simple job instructions, maintain personal appearance, and demonstrate reliability.  (Id.)

       As plaintiff points out, both Drs. Graff and Adeyermo were treating psychiatrists at San Joaquin County Mental Health Services, and both of their opinions were supported by the San Joaquin County Mental Health Services records submitted in this case.  There are hundreds of pages of treatment notes in the file which are not summarized here, but following is a sampling of significant records which are the most recent.

       On December 4, 2008, plaintiff reported to the crisis clinic that he was having suicidal and homicidal thoughts of harming his step sister and others.  Plaintiff reported at that time that he had been at Napa State Hospital because "he has gotten out of control and hurt people."  (Tr. at 434.)  On December 4, 2008, plaintiff was admitted on a 5150, for being a danger to himself and others.  At this time he was hallucinating and delusional.  He was feeling homicidal and suicidal.  He was threatening to drink alcohol and hang himself.  (Tr. at 624.)  At

9

this time, plaintiff was diagnosed with bipolar disorder, Type I, history of hypertension, status post surgery on right lower leg from gunshot wound, and was assigned a GAF score of 20/50.[5] The plan on discharge was to stabilize plaintiff's medication and obtain further diagnostic assessment. (Id. at 625.) On August 24, 2009, plaintiff denied current use of drugs, but was confronted about positive results for methamphetamine and marijuana on July 7, 2009. At this time plaintiff was distraught and depressed. The practitioner informed him that his Prozac and Neurontin would be increased to help his angry spells and depression. He was planning to live at a board and care in Lodi in order to improve compliance with his medications. (Tr. at 645.)

On August 27, 2009, plaintiff met with his "dual diagnosis group." At this time, plaintiff reported that he only drank, despite the drug use listed in recent treating notes a few days earlier. He admitted that he had a relapse in July, the month before. He recounted to the group that he had started drinking at age eight to keep up with his older brothers. He shot other gang members as a youth and spent most of his teenage and adult life in the CYA and Napa State Hospital. His son died violently which put him on a downward spiral, with three DUIs and more time in jail. He was clean and sober at this meeting. (Id. at 642.)

On September 1, 2009, plaintiff reported that he had had a couple of relapses with alcohol two months earlier.[6] (Tr. at 641.) On September 2, 2009, plaintiff was asked to leave the board and care home after being accused of inappropriately touching a female peer. He denied the accusation, claiming that the women had been smoking crack and had lied. He moved out

---

[5] GAF is a scale reflecting the "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed.1994) ("DSM IV"). According to the DSM IV, a GAF of 41-50 indicates: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." A GAF of 20 indicates "some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute). Id.

[6] The ALJ noted plaintiff's history of alcohol and drug use, and his inconsistent statements regarding his past use and when and how many times he relapsed. (Tr. at 18.)

10

immediately, however.  Plaintiff was diagnosed with bipolar disorder.  His GAF at that time was 48.  (Tr. at 639.)  At this time, plaintiff would not acknowledge how his alcohol abuse had a negative effect on his mental health issues.  (Tr. at 638.)

On September 15, 2009, plaintiff was referred to a substance abuse counselor.  (Tr. at 633.)

On September 21, 2009, plaintiff was called by behavioral health staff and he was confused and shuddering.  Stress management was provided at this time.  Plaintiff reported that he was doing well in his structured environment and following his program, including taking his medications.

The ALJ also rejected the consultative examining opinion of Dr. White, dated October 14, 2009.  He explained that this report was a one time evaluation obtained by plaintiff's representative, suggesting that it was not entirely unbiased.  The ALJ also pointed out that Dr. White admitted that plaintiff had received treatment for his bipolar disorder for ten years but had not been compliant with medication and whenever his depressive symptoms lessened, he would drop out of treatment.  The ALJ noted that Dr. White stated that if plaintiff continued to be compliant with his psychiatric and alcohol rehabilitation program, "the potential is fair for his eventual improvement to the point where he could become self-supporting in a sedentary type of work."  (Tr. at 23, 664.)  The ALJ found this statement to be markedly inconsistent with Dr. White's assessment, which had found plaintiff to be markedly limited in several areas.  The ALJ concluded by stating that "[g]iven the claimant's lapses with medication compliance and his lapses to substance use/abuse, I am not convinced that his limitations are involuntary and not related to alcohol or drug use."  (Id. at 23.)

In making her assessment, Dr. White, a psychiatrist, diagnosed plaintiff with bipolar I disorder, most recent episode depressed, severe; alcohol abuse and dependence, in partial remission; learning disorder NOS (diagnosed with dyslexia and ADHD in childhood), lifelong and chronic; and residual adult type attention deficit hyperactivity disorder.  (Tr. at 663.)

11

For her evaluation, Dr. White had reviewed medical records from 1999 through September, 2009, and records from a facility for neurologically handicapped children. (Id. at 660.) She described the progress notes as reflecting "ongoing mood volatility, poor coping skills, explosive anger outbursts, urges to act out violently when feeling pressured, low frustration level, rapid mood swings, confused thinking, motor restlessness and hyperactivity." (Id. at 663.) Although Dr. White did make the statement attributed to her by the ALJ above that plaintiff had a fair prognosis to eventually do sedentary work, she found that at the present time, he could not work. (Id. at 664.)

Dr. White completed a medical source statement, which instructed the practitioner to "not include any limitations which you believe the individual has as a result of his or her alcoholism and/or drug addiction, if any. In other words, do not include limitations which would go away if the individual stopped using drugs or alcohol." (Id. at 665.) In rating plaintiff's functional capacity, this psychiatrist found that he was markedly limited in being able to carry out detailed instructions, maintain attention and concentration for extended periods (e.g. two hours before a break), in completing a normal work day and work week without interruption from psychological symptoms, in getting along with coworkers without unduly distracting them, and in setting realistic goals or making plans independently of others. (Id. at 666-67.) Plaintiff was found to be moderately limited in the ability to remember locations and work-like procedures, carrying out short and simple instructions, performing activities within a schedule, maintain regular and punctual attendance, sustain an ordinary routine without special supervision, work in coordination with or near others without being unduly distracted by them, making simple work related decisions, interacting appropriately with the public, accepting instructions and responding appropriately to criticism from supervisors, maintaining socially appropriate behavior, responding appropriately to changes in the work setting, and traveling to unfamiliar places. (Id. at 665-67.) Plaintiff was mildly limited in the areas of understanding and remembering very short and simple instructions, being able to ask simple questions or request assistance from

supervisors, and in being aware of normal hazards and taking appropriate precautions.  (Id.)

Finally, the ALJ stated he was accepting non-examining State Agency physician Dr. Morgan's evaluation, but plaintiff contends that the ALJ failed to incorporate certain limitations by this psychiatrist into the hypothetical to the vocational expert.  As stated above, Dr. Morgan found plaintiff to be moderately limited in maintaining attention and concentration for extended periods, in completing a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without unreasonable number of rest periods, and in the ability to get along with coworkers without distracting them or exhibiting behavioral extremes.  (Id. at 389-90.)

The ALJ's hypothetical included the mental limitations of work involving simple instructions and restricted contact with the public and coworkers.  (Id. at 55.)  To the extent that the ALJ failed to include any or all of these moderate limitations in his hypothetical, there was no error.  The Ninth Circuit has already held that moderate mental limitations do not even require vocational expert testimony.  Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007).

The undersigned is not so concerned with any failure to accept these portions of Dr. Morgan's opinion, but rather much more troubled by the ALJ's reliance on a non-examining physician's report which comes to a different conclusion than examining psychiatrists, but is not based on any independent evidence, but rather the same evidence, and was written up to a year before many of the pertinent medical records were created, without the benefit of their review.  Furthermore, the report is a three page check-marked form which contains almost no findings.  Based on Lester, this opinion, without other evidence, was insufficient to reject the opinions of Drs. Graff, Adeyermo and White.

### B.  Lack of Substance Abuse Analysis

In addition to the ALJ's improper reliance on a non-examining physician without independent evidence, the ALJ failed to properly analyze plaintiff's alcohol and substance abuse which is abundant in the record.  This error was not raised by the parties.  As a result, remand is

13

necessary to correct the record on this issue as well.  There is significant evidence of alcohol or drug use in the record, requiring the case to be remanded for the ALJ to perform an appropriate analysis of whether plaintiff's addiction is a contributing factor material to disability pursuant to 42 U.S.C. § 423(d)(2)(C).  See Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001).

        The law precludes benefits for disability where substance abuse is a material contributing factor.  Contract with America Advancement Act, Pub.L. No. 104-121, 110 Stat. 847 (March 29, 1996), ( providing that an "individual shall not be considered to be disabled for purposes of [benefits under Title II or XVI of the Act] if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."); 42 U.S.C. §§ 423(d)(2)(C), 382c(a)(3)(J); see also Sousa v. Callahan, 143 F.3d 1240, 1242 (9th Cir.1998).

        The Ninth Circuit has clarified the procedure to be used in determining whether alcoholism or drug addiction is a contributing factor material to disability.  Bustamante v. Massanari, 262 F.3d 949 (9th Cir. 2001); see 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. §§ 404.1535(a), 416.935(a).  In Bustamante, the ALJ determined at step two of the disability evaluation that, absent substance abuse, Bustamante did not have a "severe" impairment.  The circuit reversed, making clear that the ALJ should first determine pursuant to the five step inquiry, whether, including drug addiction or alcoholism, an applicant is disabled.  Bustamante, 262 F. 3d at 953-55.  Only after finding an applicant disabled, does the ALJ determine whether the applicant would still be disabled if he or she stopped using drugs or alcohol.  Id. at 954. Bustamante remanded, "with instructions that the ALJ proceed with step three (and four and five, if necessary) of the disability determination without attempting to separate out the impact of Bustamante's alcohol abuse."  Id. at 956.

        Although Bustamante did not address the question, applying Bustamante through the steps of the disability analysis appears to require the ALJ to engage in a ping pong analysis,

\\\\\

factoring substance abuse into the equation and then taking it out at each step.[7]  Apparently, pursuant to Bustamante, in a substance abuse case an ALJ may need to consider each of steps 3, 4, and 5 twice – first with substance abuse factored in and then, if a finding of disability results, with it taken out.[8]  The Commissioner will need to reassess plaintiff's case, and if necessary, resubmit the question to a medical professional consistent with the proper analytical model.

Although plaintiff testified that he had been clean and sober since August, 2007, with only one relapse since that time, (id. at 16), the record is replete with questions as to whether plaintiff is stable enough to maintain this sobriety.  For example, plaintiff had inconsistently reported his past drug and alcohol use, as summarized by the ALJ:

> In October 2009, the claimant testified that but for one relapse, he did not drink after August 2007.  But on July 7, 2009, Mr. McClary admitted that he had been sober for only one month.[]  That month, a drug screen was positive for marijuana and methamphetamine.[]  The claimant denied having used methamphetamine, but stated that he had used marijuana 'to calm him down.' []  He also admitted using cocaine.[]  The drug screen report has separate entries for methamphetamine and cocaine, and I conclude that the positive methamphetamine result is not due to cocaine use.  Despite Mr. McClary's []earlier admission that he had been sober only one month, on July 8, 2009, he claimed sobriety from alcohol 'for many years now.' []  By September 2009, the claimant admitted that he drank twice in July 2009. []  In September 2009, the claimant's roommates reported that he had been drunk.  He denied this, but his therapist noted that he 'looks hung over,' with red eyes, disheveled appearance, and angry affect.[]  And only one month later, he testified that he had had only one relapse since

---

[7] A simpler approach to the problem is the one rejected in Bustamante.  If a medical determination of the severity of disability, absent substance abuse, is made at step two of the disability equation, repeating the analysis at each step of the equation is unnecessary.  The court, however, is bound by Bustamante.

[8] For example, if a determination at step three that a listed impairment is met changes when substance abuse is factored out, the ALJ apparently is to continue to the fourth step, factor the substance abuse back in, and ask whether the claimant can do his past work.  In severe substance abuse cases, the answer at step four often will be that the applicant can't do his past work, in which case the ALJ next considers whether, absent substance abuse, the equation changes.  If the inquiry continues to the fifth step, the question is whether, including the substance abuse, there is any other work in the national economy the applicant can do.  Assuming severe substance abuse, the answer again likely is to be that the applicant can't do any other work.  However, the ALJ must again consider the final step, absent the substance abuse.

> August 2007. Mr. McClary's therapist stated: 'Clt is not
> acknowledging how his alcohol abuse could be negatively affecting
> his mental health issues.' []

(Tr. at 18.)

Dr. White on October 14, 2009, one of the most recent records, diagnosed plaintiff in part with alcohol abuse and dependence, in *partial* remission. (Id. at 663.) (emphasis added).

The ALJ refers to plaintiff's past alcohol and substance abuse dating back to his childhood, and his recent use, as set forth above. The ALJ also found one of plaintiff's severe impairments to be "history of alcohol abuse in reported recent remission." (Tr. at 14, 16.) The ALJ further noted that Dr. Adeyermo failed to consider both plaintiff's lack of compliance with medications and relapses in alcohol and drug use. (Id. at 23.) The ALJ also critiqued Dr. White's opinion, noting her opinion that plaintiff could work if he continued to comply with his alcohol rehabilitation program, but stating that based on his relapses, the ALJ was not convinced that plaintiff's limitations were "involuntary and not related to alcohol abuse or drug use." (Id. at 23.) Although the ALJ repeatedly acknowledged plaintiff's current alcohol and drug use, he appears to have considered these facts only in rejecting the opinions of treating and examining physicians and in finding that plaintiff was not fully credible. He failed to analyze the issue under Bustamante where the record clearly required it.

Plaintiff's alleged mental impairments, especially his bipolar disorder, have a connection with drug usage. There is a causal connection between the alcohol and drug usage and plaintiff's bipolar disorder, i.e., it has been suggested that plaintiff used alcohol to self-medicate. As stated by Dr. White:

> [a]lthough alcoholism and bipolar disorder are mutually
> aggravating conditions, sobriety may be accompanied by a
> resurgence of psychiatric symptoms when self-medication is no
> longer available. Therefore it is imperative that Mr. McClary be
> compliant with ongoing psychiatric treatment and continue []in an
> alcohol rehabilitation program so as to learn how to cope with his

16

> dysfunctional emotional and behavior patterns without the use of alcohol.

(Tr. at 664.) Furthermore, using alcohol to self-medicate and taking prescription medication for bipolar disorder are usually mutually exclusive. The clear implication from this argument, whether scientifically valid or not, is that if plaintiff had not violated his treatment regime by using alcohol, the severity of his bipolar disorder would be much diminished.

This brings the court to the final issue – why raise this matter of preclusion of benefits because of drug usage when the parties have not raised it, and fairly obviously, purposefully not raised it. The Commissioner may be desirous of simply getting a favorable decision affirmed – so why directly raise an issue which requires a remand. Plaintiff, quite clearly, would not want to raise an issue which could very well spell the end of his disability application. However, where Congress has clearly spoken of its intent in this area, and mandated a preclusion of disability benefits if a disabling impairment bears a connection with drug usage, the parties should not be asking the court, in effect, to ignore this mandate. There is no legitimate way the undersigned can adjudicate this case in the face of a controlling statute which the parties desire not to exist.

The court is by no means finding that plaintiff is disabled. Plaintiff has also determined not to contest the ALJ's finding that he is not credible, and the record reflects inconsistencies in his alcohol and drug use and his statements concerning the time periods when he used and how recently he drank. Nevertheless, difficult as it is, the case must be remanded so that the ALJ can make a proper <u>Bustamante</u> analysis and also to apply controlling treating/examining/non-examining physician rules. If it turns out that even after additional development, where an examining mental health specialist is asked to attempt to separate non-alcohol abuse induced problems from those caused by drinking, the record remains as sparse as it is, a denial of benefits would be warranted simply because plaintiff has not, and cannot, meet his burden of proof. But it should not be based upon a manipulation of an inadequate record.

Therefore, the case must be remanded for further proceedings. On remand, the ALJ is directed to obtain further medical expertise, if necessary, in order to make a determination of what, if any, work plaintiff can do if he complies with his medication regimen and does not abuse alcohol or drugs. The ALJ must also apply the <u>Bustamante</u> analysis set forth above. For this reason, plaintiff's remaining issue will not be addressed.

<u>CONCLUSION</u>

Accordingly, IT IS ORDERED that:

1. Plaintiff's Motion for Summary Judgment is GRANTED in part pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for Summary Judgment is DENIED, and this matter is remanded for further findings in accordance with this order. The Clerk is directed to enter Judgment for plaintiff.

2. Given the satisfactory showing made in the Declaration of Bess M. Brewer (Dkt. No. 20), the January 31, 2012 order to show cause why this case should not be dismissed for lack of prosecution is discharged.

DATED: July 16, 2012

                               /s/ Gregory G. Hollows
                         UNITED STATES MAGISTRATE JUDGE

GGH/076
McClary1226.ss.wpd